# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2911

_____

Voyageurs National Park Association;  *
Sierra Club; Help Our Wolves Live;  *
Humane Society of the United States;  *
Superior Wilderness Action Network;  *
Minnesota Wolf Alliance; Minnesotans  *
for Responsible Recreation; Defenders  *
of Wildlife,  *
 *
        Appellants,  *
 *   Appeal from the United States
    v.  *   District Court for the
 *   District of Minnesota.
Gale A. Norton, Secretary of the  *
Interior; Fran P. Mainella, Director,  *
National Park Service; Steven A.  *
Williams, Director, U.S. Fish and  *
Wildlife Service; United States  *
Department of the Interior,  *
 *
        Appellees,  *
 *
Minnesota United Snowmobilers  *
Association,  *
 *
        Intervenor Below.  *

_____

Submitted: May 14, 2004
Filed: August 25, 2004

_____

Before LOKEN, Chief Judge, SMITH, Circuit Judge, and DORR,[1] District Judge.
_____

SMITH, Circuit Judge.

Voyageurs National Park Association ("the Association") appeals the grant of summary judgment to the National Park Service ("Park Service") on the Association's complaint seeking to enjoin the Park Service's decision to open eleven bays of the Voyageurs National Park to recreational snowmobile use. The Association, utilizing the Administrative Procedure Act, seeks review of the Park Service's decision allowing expanded snowmobile use during the winter of 2000-2001. The Park Service's decision was made pursuant to a Park Service regulation that opened certain areas of the Park to snowmobiling (including the eleven frozen bays at issue in this case), and which also gave the Park Service the authority to temporarily close trails for various safety and environmental reasons. 36 C.F.R. §7.33(b). The Association claims that the 2001 decision violated the Park Service's rule-making requirements, the National Environmental Policy Act, and the Endangered Species Act. The Association also argues that the district court[2] committed reversible error in its refusal to permit discovery in this case. We affirm.

## I. *Background*

Voyageurs National Park, which lies in the southern part of the Canadian Shield, was created by a 1971 act of Congress. The Park received its name from a group of French-Canadian canoe-men, known as "voyageurs," who traveled its waters in their birch-bark canoes from the Great Lakes to the interior of the western United

_____

[1] The Honorable Richard E. Dorr, United States District Judge for the Western District of Missouri, sitting by designation.

[2] The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

States and Canada.[3] A vast wilderness area, Voyageurs is home to some of Minnesota's most endangered wildlife, including the gray wolf and the bald eagle. The Park also provides a recreational resource for boaters, campers, hikers, anglers, cross-country skiers, snowshoers, ice-fishermen, and snowmobilers.

Congress delegated certain regulatory authority to the Park Service by which it can control visitor access and use of Voyageurs. Two of these Park Service regulations–36 C.F.R. §§ 1.5 and 7.33–are implicated in this appeal. The first, § 1.5 is a general regulation applicable to all units of the National Park System while the second, § 7.33, is a more narrow regulation that specifically governs snowmobiling at Voyageurs.

Section 7.33, promulgated in 1991, designated certain areas of Voyageurs as available for snowmobile use. Those areas include "[t]he frozen waters of Rainy, Kabetogama, Namakan, Mukooda, Little Trout and Sand Point Lakes." 36 C.F.R. § 7.33(b)(1)(i). The regulation further provided that the park's superintendent "may determine yearly opening and closing dates for snowmobile use, and temporarily close trails or lake surfaces, taking into consideration public safety, wildlife management, weather, and park management objectives . . . ." 36 C.F.R. § 7.33(b)(3).

---

[3] Of Minnesota's famed "10,000 Lakes," more than thirty of them form the freshwater base and boundaries of the Park. The Park contains all or part of four large lakes (Rainy, Sand Point, Namakan, and Kabetogama), each of which contains many bays and inlets.

Much litigation followed the passage of § 7.33.[4] Indeed, the Association immediately brought suit challenging the regulation and seeking to enjoin the Park Service from opening the designated areas to snowmobiling. In resolving the dispute, we held that neither the Park Service's regulations permitting snowmobiling nor the ultimate decision to open areas of Voyageurs to snowmobiling were arbitrary or capricious. *Voyageurs Regional National Park Assoc. v. Lujan* 966 F.2d 424 (8th Cir. 1992) (*Voyageurs II*).

However, in December of 1992, the Park Service–in an exercise of its authority under § 7.33–temporarily closed seventeen of Voyageurs's bays to snowmobiling. The Park Service renewed these closures for the 1993-1994 and 1994-1995 snowmobiling seasons. In 1994, the Park Service was again sued. This time the suit was brought by a group of snowmobilers, including the Minnesota United Snowmobiling Association. The suit alleged that the bay closures were improper and legally defective. Once again, an appeal came to this court. We determined that the Park Service's actions were neither arbitrary nor capricious. *Mausolf v. Babbitt*, 125 F.3d 661 (8th Cir. 1997) (*Mausolf III*). We also noted that the closures were only temporary and, thus, annual renewal was required in order for the closure to remain effective. *Id*.

In 1996, the Park Service reopened six of Voyageurs seventeen lake-bays to snowmobile use, but eleven of the bays remained closed. However, in 2001, these eleven bays were reopened to snowmobilers. Upon reopening, the Park Service reserved the right to limit the use of motorized-winter sports in the bays for safety reasons or to promote other interests of park management.

---

[4] *See, e.g.*, *Voyageurs Regional National Park Assoc. v. Lujan*, No. 4-9-434, 1991 WL 343370, *slip op.* (D. Minn. 1991) (*Voyageurs I*); *aff'd by* 966 F.2d 424 (8th Cir. 1992) (*Voyageurs II*); *Mausolf v. Babbitt*, 913 F.Supp. 1334 (D. Minn. 1996) (*Mausolf I*); *Mausolf v. Babbitt*, 85 F.3d 1295 (8th Cir. 1996) (*Mausolf II*); *Mausolf v. Babbitt*, 125 F.3d 661 (8th Cir. 1997) (*Mausolf III*).

Over a decade after the Park Service initially passed snowmobiling regulations, the litigation over these regulations' meaning and implementation continues. In this latest case, the Association argues that because snowmobiling may harm the bald-eagle and the gray-wolf populations, the eleven bays that were closed between 1996 and 2001 should remain closed to snowmobiling. As to the relief the Association seeks, it requests that we reverse the district court's grant of summary judgment in the Park Service's favor and asks us to remand with direction to order these eleven bays closed to winter recreational use. In the alternative, the Association asks that it be granted limited discovery and the district court decision be vacated for further proceedings.

II. *Discussion*

A. *Standard of Review*

We review de novo a grant of summary judgment, applying the same legal standards used by the district court. *Darst-Webbe Tenant Assoc. Bd. v. St. Louis Housing Auth.,* 339 F.3d 702, 709 (8th Cir. 2003). Judicial review of administrative decisions is governed by the Administrative Procedures Act ("APA"). 5 U.S.C. § 706. Under the APA, our review of an agency decision is limited. We are only permitted to set aside agency action that is "arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Our review standard requires that we give "agency decisions a high degree of deference." *Sierra Club v. Envtl. Prot. Agency*, 252 F.3d 943, 947 (8th Cir. 2001).

We review whether the agency's decision was "based on consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). If an agency's determination is supportable on any rational basis, we must uphold it. *Friends of Richard-Gebaur Airport v. FAA*, 251 F.3d 1178, 1184 (8th Cir. 2001). This is especially true when an agency is acting within its own sphere of expertise. *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1128 (8th Cir. 1999)

("[w]hen the resolution of the dispute involves primarily issues of fact and analysis of the relevant information requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies.") (citations omitted).

B. *National Environmental Policy Act*

The Association argues that the Park Service failed to conduct a proper National Environmental Policy Act ("NEPA") review prior to its decision to reopen the eleven bays that had been closed from 1996 until 2001. The NEPA requires all federal agencies, including the Park Service, to prepare an environmental impact study for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). There is, however, no dispute that the Park Service conducted a full NEPA review in conjunction with the enactment of § 7.33, which governs snowmobile usage at Voyageurs. The question we consider is whether the Park Service must conduct a full NEPA review before deciding that it will not renew its annually-made decision to close some of Voyageurs' bays to motorized-recreational activity.

Our court has twice reviewed the Park Service's decisions regarding the use of snowmobiles at Voyageurs–first considering the Park Service's decision to allow snowmobile use, then considering its decision to suspend their use. In each of these decisions, we were satisfied that the Park Service could limit or expand the scope of permissible snowmobile activity without a full-blown NEPA review. Now, after reviewing the instant appeal we are satisfied that the Park Service has complied with its obligations under the law. The opening and closing of the bays are temporary measures, which must be renewed annually. It is impractical to require full NEPA review each year. Rather, we conclude that the opening and closing of the bays is a discretionary Park Service decision that is subject only to the Park Service's obligation (as well-stated by the district court) to be a "faithful steward of national resources" and its own procedural rules and regulations as set forth at 36 C.F.R. § 1.5.

According to the Park Service's own rule 36 C.F.R. § 1.5(b), "a closure . . . or the termination or relaxation of such, which is of a nature, magnitude and duration that will result in a significant alteration in the public use pattern of the park area, adversely affect the park's natural, aesthetic, scenic or cultural values, require a long-term or significant modification in the resource management objectives of the unit, or is of a highly controversial nature, shall be published as rulemaking in the Federal Register." However, closures or terminations of closures that do not rise to this level are subject only to the procedural requirements of § 1.5(c) and 36 C.F.R. § 1.7. The § 1.5(c) procedures require the park superintendent to prepare a written determination justifying the decision, and § 1.7 requires the park superintendent to publicize the decision in a specified manner. Further, § 1.7 requires that the public be notified of the change, after the fact, through signage, maps, publication in local newspapers, and/or "[o]ther appropriate methods."

The Association suggests that § 1.5(b) of the Park Service's procedural regulations more aptly describe the Park Service's obligations with regard to the bay openings because the decision could cause significant alteration of the area. The Park Service, on the other hand, believes that its legal obligations surrounding the bay reopenings are set forth in § 1.5(c) and § 1.7. We agree. This position is consistent with our prior holding in *Mausolf III* in which we concluded that no formal rule making–as established in § 1.5(b)–was required of the Park Service prior to closing bays that were otherwise designated for snowmobile use. We found that closing a few bays in the enormous Voyageurs system would not amount to a "significant alteration" of its use. Likewise, it also follows that opening these eleven areas does not implicate the formal rulemaking required by § 1.5(b). In fact, the initial regulations permitting snowmobiling in Voyageurs (which received full-blown NEPA review) allowed snowmobiling in all of the bays where the activity is now permitted.

Therefore, we need only consider whether the Park Service's decision to open the bays complied with the limited-notice requirements of § 1.7 (as set out above) and

the Park Service's general stewardship obligations. Finding no notice violation–and considering the substantial amount of scientific evidence, albeit at times contradictory, contained in the record that thoroughly outlined the impact of snowmobiling on the gray-wolf and bald-eagle habitats–we find the Park Service's decision opening the bays to be neither arbitrary nor capricious.

## C. *Endangered Species Act*

The Association also argues that the Park Service violated the Endangered Species Act ("ESA")[5] in its failure to formally consult with the Fish and Wildlife Service ("FWS") before opening the eleven bays to snowmobiles. The ESA requires federal agencies to consult with the appropriate federal fish and wildlife agency when their actions "may affect" an endangered or threatened species.[6] The Park Service concedes that it was required to seek formal FWS consultation but that it failed to do so until after the bays were reopened. However, the Park Service directs our attention to the informal communication that occurred prior to the reopening of the bays–the Park Service and FWS jointly evaluated data in 1996, had a joint meeting with scientists and agency representatives in 1997, and exchanged scientific evidence on the issues in 2001. Informal communication also occurred in December of 2001. Although the formal consultation was delayed, it was eventually completed in January of 2002.

Acknowledging the technical violation, we must consider whether it is rendered moot by subsequent compliance of the Park Service. In its consideration of a similar scenario–the effect of a post-hoc "formal" consultation–the Tenth Circuit adopted the "prudential mootness" view. *Southern Utah Wilderness Alliance v. Smith*,

---

[5] Codified at 16 U.S.C. § 1536.

[6] Codified at 16 U.S.C. § 1536(a)(2) and 50 C.F.R. § 402.14(a).

110 F.3d 724 (10th Cir. 1997).[7] Our sister circuit found that a claim that seeks both declaratory and injunctive relief was mooted when the required consultation was completed, even if such consultation did not occur before the implementation of the policy change. *Id*. We consider this view to be sound and adopt its reasoning. Therefore, after the Park Service and the FWS completed their formal consultation in January, the procedural defect identified by the Association was cured and the Association's claim for relief–seeking the remedy of formal consultation–was rendered moot.

The Association also alleges that the Park Service and FWS relied primarily on a "Draft Study" to support the conclusion that the openings would not adversely impact the bald eagle and gray wolf. This alleged reliance, according to the Association, establishes that the agencies acted arbitrarily and capriciously (in violation of the ESA). Specifically, the Association argues that the Park Service failed to make an adequate assessment of whether the reopening of these eleven bays would have a negative affect on these endangered species. We disagree. The Park Service used studies produced over about a nine year period (some supporting the opening of the bay, while others favored its closure) in its consideration of the effects the reopening would have on the bald eagle and the gray wolf and their habitats. While reasonable people may disagree with the Park Service's ultimate decision, the record does not show it was arbitrary or capricious.

D. *Record on Review*

The Association next argues that "[j]udicial review of the legality of [the Park Service's] action to open the bays under NEPA and 26 C.F.R. § 1.5 was thwarted by the district court's decision to prohibit limited discovery to fill in these gaps . . . ." The

---

[7] The court in *Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.*, 82 F. Supp.2d 1070 (D. Ariz. 2000), similarly found that a Forest Service consultation with FWS (after suit was filed) rendered the action moot because the plaintiffs' only requested remedy was consultation.

district court concluded that "[t]he administrative record contains sufficient information about the basis for the agency decision . . . " and, as such, denied the Association's motion for discovery to supplement that record. This decision is entitled to deference "absent a gross abuse of discretion." *Tenkku v. Normandy*, 348 F.3d 737, 743 (8th Cir. 2003).

It is well-established that judicial review under the APA is limited to the administrative record that was before the agency when it made its decision. *Overton Park*, 401 U.S. at 420; *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985); *Newton County Wildlife Assoc. v. Rogers*, 141 F.3d 803, 807 (8th Cir. 1998) ("APA review of agency action is normally confined to the agency's administrative record."). That record, "not some new record made initially in the reviewing court," becomes the "focal point" for judicial review. *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Corning Savings & Loan Assoc. v. Fed. Home Loan Bank Bd.*, 736 F.2d 479, 480–81 (8th Cir. 1984). By confining judicial review to the administrative record, the APA precludes the reviewing court from conducting a de novo trial and substituting its opinion for that of the agency. *United States v. Morgan*, 313 U.S. 409, 422 (1941).

However, certain exceptions have been carved from the general rule limiting APA review to the administrative record. These exceptions apply only under extraordinary circumstances, and are not to be casually invoked unless the party seeking to depart from the record can make a strong showing that the specific extra-record material falls within one of the limited exceptions. *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436–38 (9th Cir. 1988). When there is "a contemporaneous administrative record and no need for additional explanation of the agency decision, 'there must be a strong showing of bad faith or improper behavior' before the reviewing court may permit discovery and evidentiary supplementation of the administrative record." *Newton*, 141 F.3d at 807–808 (quoting *Overton Park*, 401 U.S. at 420).

The Association's argument hinges on its assertion that the administrative record is incomplete and thus will frustrate effective judicial review. However, the exception allowing extra-record evidence to explain the administrative record and agency decision is very narrow. Inquiry into the mental processes of administrative decisionmakers is to be avoided unless it is "the only way there can be effective judicial review." *Overton Park*, 401 U.S. at 420; *Camp*, 411 U.S. at 142–43.

The Association's claims notwithstanding, the administrative record in this case–which consists of over ten-thousand pages of reports, correspondence, studies and analyses–is fully sufficient to facilitate judicial review without discovery. We are satisfied that the district court's denial of extra-record discovery was not an abuse of discretion, and the decision is therefore affirmed.

### III. *Conclusion*

In sum, we find that the Park Service, in electing not to close eleven bays to snowmobiling, appropriately exercised its discretionary authority under federal law. In 1991, when the snowmobiling regulation was promulgated, it was subject to full rule-making requirements, including publication in the Federal Register, notice, and comment. It was also subject to environmental review under NEPA. Further, the Park Service and the FWS consulted regarding the impact of snowmobiling on endangered species–the gray wolf and the bald eagle in particular–prior to the Park Service's 2001 decision.

The Park Service did not decide to "open" the eleven bays to snowmobiling in 2001. The bays were in fact opened to snowmobiling in 1991. 36 C.F.R. § 7.33(b). Although, by regulation, the Park Service "may" temporarily close specific areas of Voyageurs, the position that the Park Service "opened" bays to snowmobiling in 2001 is inaccurate. Nothing in the administrative record establishes that the Park Service was arbitrary or capricious in carrying out its NEPA and ESA obligations in conjunction with the 1991 opening of these bay areas to motorized-recreational use.

Based upon our review of the present record, we hold the Park Service was not arbitrary or capricious in its subsequent "reopening" of these eleven bays after deciding not to renew the annually-decided closing.

We have carefully considered all other arguments made by the Association and conclude they are without merit and require no discussion. For the foregoing reasons, the judgment of the district court is affirmed in all respects.

_____