SIERRA CLUB and Defenders of Wildlife, Plaintiffs,

v.

Dale BOSWORTH, as Chief of the United States Forest Service, and Ann M. Veneman, as Secretary of the United States Department of Agriculture, Steven A. Williams, as Director of the United States Fish and Wildlife Service, and Gale Norton, as Secretary of the Interior, Defendants,

and

Minnesota Forest Industries, Inc., and Minnesota Timber Producers Association, Intervenors–Defendants.

No. CIV. 03–3572(MJD/JSM).

United States District Court, D. Minnesota.

Jan. 14, 2005.

Anne E. Mahle, Faegre & Benson LLP, Minneapolis, MN, for Plaintiffs.

Friedrich A.P. Siekert, Assistant United States Attorney, Minneapolis, MN, for Defendants.

David R. Oberstar, Fryberger, Buchanan, Smith & Frederick, P.A., Duluth, MN, for Intervenors–Defendants.

### MEMORANDUM OF LAW & ORDER

DAVIS, District Judge.

## I. INTRODUCTION

The subject of this environmental action is the United States Forest Service's ("Forest Service" or "FS") Big Grass Project ("the Project"), which is adjacent to the Boundary Waters Canoe Area Wilderness ("BWCAW" or "Boundary Waters"), and which Plaintiffs allege violates the National Environmental Policy Act ("NEPA") and its implementing regulations, the National Forest Management Act ("NFMA") and its implementing regulations, the Superior National Forest Land and Resource Management Plan ("1986 Forest Plan"), the Endangered Species Act ("ESA"), and the Administrative Procedure Act ("APA").

Before the Court are Plaintiffs' motion for summary judgment; the Intervenors–Defendants' and the Defendants'[1] cross-motions for summary judgment against Plaintiffs; Defendants' motion to dismiss Plaintiff Defenders of Wildlife, as well as some claims, for lack of subject matter jurisdiction; and two pleadings neither referred to Magistrate Judge Erickson nor considered by his Report: Plaintiffs' motion to supplement the administrative record and Plaintiffs' motion for preliminary injunction. The parties presented their oral argument on October 13, 2004.

## II. FACTUAL BACKGROUND

### A. Superior National Forest and the Big Grass Project

This case involves agency action in the Superior National Forest, a second-growth forest that contains the Boundary Waters. In February 2003, the Forest Service issued its Decision Notice authorizing the sale of timber from the Project, which is bordered on the northeast and southwest by units of the Boundary Waters. If approved, the Project will eventually harvest timber on approximately 1,689 of the over

---

1. For convenience, this Memorandum and Order shall refer to both Defendants and Intervenors–Defendants as "Defendants."

2 million acres of land in the Superior National Forest, including the "clearcutting with reserves" of 1,488 acres. The proposal will include the following road projects: 13.2 miles of construction, 19.9 miles of reconstruction, and reopening 9.2 miles of roads.

## B. Environmental Assessment of the Project

The Forest Service initially proposed the Big Grass Timber Sale in January 2001. The Forest Service thereafter prepared an Environmental Assessment ("EA") pursuant to NEPA. Under 40 C.F.R. § 1508.9, an EA is a short document developed to determine the need for a full Environmental Impact Statement ("EIS"). The review process for the EA included the following: forming a team of specialists; soliciting public comment; consulting with federal, state, and private consultants; meeting with interested persons; and evaluating and addressing the comments received. The Decision Notice determined that the Project was not a major federal action that would impact the quality of the human environment significantly, so it concluded that an EIS was unnecessary.

The Forest Service considered four alternatives with regard to the Project, and its EA Decision Notice ultimately adopted Alternative Four, which included a combination of tree harvests, regeneration, ecosystem management plantings, hand release to ensure adequate survival and stocking of plantings, construction of temporary and system roads, relocation of an intersection, improving FS roads, and performing fuels management through prescribed fire. Plaintiffs argue that the selected Alternative Four involves the most logging, the greatest acreage of clear-cuts, and the largest amount of active roadways.

## C. Management of the Superior National Forest

Forest Service activities in the Superior National Forest are governed by the NFMA and the 1986 Forest Plan. These laws require the Forest Service to monitor the health of the forest and its species, including population trends of wildlife such as Management Indicator Species ("MIS") and Viability Indicator Species ("VIS"). *See* 16 U.S.C. § 1604(g) (2003); 36 C.F.R. § 219.11(d); 36 C.F.R. § 219.19(a)(7); (1986 Forest Plan at 3–1, 3–42).

MIS represent all of the community types and habitat conditions that Forest Service management activities may affect. Because each species prefers a particular community or habitat condition, its population level is likely to change with the availability of that habitat type or condition. (1986 Forest Plan at 3–42). VIS include species chosen from federally listed Endangered and Threatened species, as well as from the Sensitive Species and the Species of Concern. (*Id.* at 3–39).

The 1986 Forest Plan expired in 2001, and the Forest Service has been developing a successor plan since 1997. 36 C.F.R. § 219.10(g). A Draft EIS and Proposed Forest Plan were issued in April 2003. The final revised Forest Plan was signed just prior to the parties' oral argument on these motions.

The initial objectives of the Big Grass Project included providing a viable ecosystem for plants, animals, and people; increasing certain types of trees; increasing several wildlife species; furthering fire management objectives, including allowing fire to become a part of the ecosystem; providing access to landowners; resolving encroachments in the area; developing a road system; and supplying raw wood for the timber industry.

### D. Impacts to the Neighboring Boundary Waters

The Big Grass EA defines the Project Area as having a "unique" location as an "important corridor" between sections of the Boundary Waters. Because there is no certified survey of the BWCAW boundaries, the Forest Service is not certain, in some instances, of exactly where the wilderness boundary lies. But Defendants contend that GPS receivers can precisely determine the boundaries to ensure that timber harvesting does not occur within the BWCAW. In a letter dated July 19, 2002, the Forest Service acknowledges that past illegal use of the forest's logging roads has led to unauthorized development in areas surrounding the Boundary Waters.

### E. Canada Lynx

The Project area includes the habitat of the Canada lynx. The Fish and Wildlife Service ("FWS") concurred with the Forest Service's determination that the Big Grass Timber Sale "may affect, [but is] not likely to adversely affect" the Canada lynx. In determining that the Project will not adversely affect the lynx, the Forest Service's Biological Evaluation ("BE") noted that "there are no habitats designated as 'critical' (as defined by the ESA) within the [Project Area]." But by as late as 2002, the FWS has failed to designate any land in the United States as critical habitat for the lynx. *Defenders of Wildlife v. Norton,* 239 F.Supp.2d 9, 21–22 (D.D.C.2002), *vacated as moot* by 89 Fed.Appx. 273, 2004 WL 438590 (D.C.Cir.2004) (unpublished).

### F. Administrative Appeal and the Instant Suit

On March 25, 2003, the Sierra Club initiated an administrative appeal of the Forest Service's decision, though Defenders of Wildlife did not join in that appeal. On May 8, 2003, the Appeal Deciding Officer affirmed the Forest Service's decision and finding of no significant impact. Plaintiffs Sierra Club and Defenders of Wildlife next filed a complaint with this Court, alleging (1) that the Forest Service violated NEPA and the APA by not preparing an EIS, (2) that the Project violates the NFMA by failing to have specific population data for five of the species in the forest, and (3) that the Endangered Species Act was violated by both the Forest Service and the Fish & Wildlife Service when they concluded that the Canada lynx is not likely to be negatively affected by the Project.

## III. DISCUSSION

### A. Preliminary Issues: Subject Matter Jurisdiction and Supplementation

The parties raise two preliminary issues that the Court will analyze before addressing the parties' substantive claims. Defendants contend that Plaintiff Defendant Defenders of Wildlife should be dismissed, and Plaintiffs argue that they should be permitted to supplement the administrative record.

### 1. Subject Matter Jurisdiction: Defenders of Wildlife

Defendants bring a Motion to Dismiss, claiming that the Court lacks subject matter jurisdiction over Plaintiff Defenders of Wildlife because of its failure to properly exhaust administrative remedies. *See* Fed.R.Civ.P. 12(b)(1).

 A party aggrieved by administrative agency action must exhaust available administrative remedies before seeking judicial relief. *See McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969); *see also* 7 U.S.C. § 6912(e). "The exhaustion doctrine guarantees administrative autonomy and efficiency, and ensures that administrative agencies are afforded an opportunity to

address their own errors without judicial intervention." *Sharps v. United States Forest Serv.*, 28 F.3d 851, 854 (8th Cir. 1994). Objections to agency actions that a party does not raise administratively cannot properly be raised in court. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 124 S.Ct. 2204, 2213–14, 159 L.Ed.2d 60 (2004).

Defendants argue that because it is uncontested that Plaintiff Defenders of Wildlife did not appeal the Project decision administratively, it should be dismissed as a party to this action. Although Plaintiffs reply that Defenders has standing, they provide no support for this contention. In light of the uncontested fact that the Sierra Club, alone, filed an administrative appeal, Plaintiffs' position that a claim under the Endangered Species Act ("ESA") is legally distinct from the appeal of the forest planning statutes is not persuasive.

To have remained a party to this case, Defenders must have exhausted all administrative remedies; the undisputed record demonstrates that they have not. As such, Defenders of Wildlife is appropriately dismissed as a party.

### 2. Motion to Supplement Administrative Record

Plaintiffs moved to supplement the administrative record, which—as it currently stands—consists of more than 3,000 pages that take up approximately seven binder volumes. The five documents Plaintiffs seek to add fall under the following two categories: Forest Plan revision documents and vicinity maps showing other neighboring timber projects. Defendants oppose the request because they argue that this case lacks the extraordinary circumstances required for supplementation.

Judicial review under the APA is generally limited to the administrative record that was before the agency at the time it made its decision. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420,

91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *overruled on unrelated grounds by Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); *Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 766 (8th Cir.2004). Certain extraordinary circumstances have been recognized to justify extra-record supplementation, but these exceptions remain "very narrow." *Voyageurs*, 381 F.3d at 766. If there is a contemporaneous administrative record and no need for additional explanation of the agency decision, only "a strong showing of bad faith or improper behavior" will permit a reviewing court to allow discovery and evidentiary supplementation of the administrative record. *Id.*

Plaintiffs contend that the additional documents are necessary to demonstrate that the Forest Service failed to consider the Forest Plan revision and the neighboring timber projects. The Court agrees with Defendants that supplementation of the administrative record is the exception, rather than the rule. And even if the Court were to permit the admission of the documents, the Forest Plan revision documents that Plaintiffs seek to add were fluid and were not the final, controlling documents. Further, the vicinity maps lack detail regarding management activities and are narrow in scope. Because the Eighth Circuit, in *Voyageurs*, demonstrated a strong preference for excluding extra-record documentation, and because this Court must avoid extra inquiry into the mental processes of decision makers unless the lack of supplemental material would thwart effective judicial review, Plaintiffs' motion to supplement the record is denied.

### B. Summary Judgment Standard and Scope of Review

A party is entitled to summary judgment if the record contains no genuine issue of material fact and judgment is ap-

propriate as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Friends of the Boundary Waters Wilderness v. Dombeck,* 164 F.3d 1115, 1121 (8th Cir.1999). A court must set aside an agency decision as arbitrary and capricious if the agency (1) has relied on factors that Congress has not intended it to consider, (2) has entirely failed to consider an important aspect of the problem, or (3) has offered an explanation for its decision that runs counter to the evidence before the agency. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see Dombeck,* 164 F.3d at 1120.

Plaintiffs, here, assert claims under the NFMA, ESA, and NEPA. Because these statutes provide no provisions for judicial review, Plaintiffs' claims must be asserted pursuant to the Administrative Procedure Act ("APA"). Accordingly, Plaintiffs claim that Defendants' actions were arbitrary and capricious, in violation of the APA. 5 U.S.C. § 702(2)(a); *see Sierra Club v. EPA,* 252 F.3d 943, 947 (8th Cir.2001). In such actions, an agency's decision enjoys a "high degree of deference." *Sierra Club,* 252 F.3d at 947. This Court must determine whether the Forest Service's decision followed from the facts on which it relied, or whether the Forest Service instead made a clear error of judgment. *Earth Protector, Inc. v. Jacobs,* 993 F.Supp. 701, 706 (D.Minn.1998) (citing *Audubon Soc'y of Cent. Ark. v. Dailey,* 977 F.2d 428, 434 (8th Cir.1992)).

## C. Forest Service's Alleged Violation of NFMA's Implementing Regulations, 1986 Forest Plan, and APA

Plaintiffs argue that because the Forest Service did not monitor or provide population data for MIS and VIS, it violated the National Forest Management Act ("NFMA"), the 1986 Forest Plan, and 36 C.F.R. § 219.19. *See* 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(e).

## 1. National Forest Management Act

The National Forest Management Act ("NFMA") directs the Secretary of Agriculture to formulate forest plans for the national forests. 16 U.S.C. § 1604(g)(1). The 1986 Forest Plan was prepared pursuant to NFMA, which requires the Forest Service to do the following:

(1) to ensure habitat adequate to "maintain viable populations of existing native vertebrate species," 36 C.F.R. § 219.19, 36 C.F.R. § 219.27(a)(6);

(2) "to provide for … diversity of plant and animal communities," 36 C.F.R. § 219.26, 36 C.F.R. § 219.27(a)(5);

(3) to identify management indicator species, 36 C.F.R. § 219.19(a)(1); and

(4) to undertake monitoring and evaluation of the populations of management indicator species and their habitats, other species, and species diversity in general. 36 C.F.R. § 219.19(a)(2), 36 C.F.R. § 219.19(a)(6), 36 C.F.R. § 219.26, 36 C.F.R. § 219.27.

During revisions of a forest plan, an agency must examine "areas contiguous to existing wilderness" for potential wilderness designation. 36 C.F.R. § 219.17(a)(1)(ii).

## 2. Population Data for Management & Validity Indicator Species Under NFMA

The Forest Service is required to monitor the population trends of MIS, which are particularly important "because their population changes are believed to indicate the effects of management activities." 36 C.F.R. §§ 219.19(a)(1) & (6). As such, the regulations require each Forest Supervisor

to "obtain and keep current inventory data appropriate for planning and managing the resources under his or her administrative jurisdiction." 36 C.F.R. § 219.12(d). Together, the regulations and the 1986 Forest Plan require that the Forest Service specifically consider MIS and VIS species in taking the requisite "hard look" at a project. As the EA notes, "Population and viability monitoring of MIS and VIS is a requirement in our forest plan." (Admin. Rec. at 00789).

Plaintiffs argue that the Forest Service has failed to maintain population data for five of the Superior National Forest's MIS/VIS in the Project Area: the boreal owl, black tern, porcupine, spruce grouse, and northern leopard frog. They note that the EA's narrative section does not include actual population numbers for any MIS/VIS; the Forest Service instead relies on the presence of habitat and not on actual population data.

■ The Court agrees with Defendants that the population data, while encouraged, is not necessary under the NFMA or its implementing regulations. See Inland Empire Pub. Lands Council v. United States Forest Serv., 88 F.3d 754, 761 n. 8 (9th Cir.1996) (population data encouraged but not required). Plaintiffs point to decisions that have held that habitat data alone cannot substitute for actual population data. Sierra Club v. Martin, 168 F.3d 1, 5 (11th Cir.1999); Idaho Sporting Congress, Inc. v. Rittenhouse, 305 F.3d 957, 972–73 (9th Cir.2002); see Forest Guardians v. United States Forest Serv., 180 F.Supp.2d 1273, 1279–80 (D.N.M.2001). But other Circuit decisions have held that the regulation does not require analysis of population size. See Ind. Forest Alliance, Inc. v. United States Forest Serv., 325 F.3d 851, 863 (7th Cir.2003) (holding that the Forest Service's listing of habitat data was sufficient under its "considerable discretion," and that "none of these regulatory sources imposes such a specific requirement [of providing population data] on the Forest Service"); Inland Empire Pub. Lands Council, 88 F.3d at 761 n. 8 (population data encouraged but not required, and monitoring available habitat as a method of monitoring populations of species was "eminently reasonable").

This Court addressed similar arguments in 2002, regarding the Rocky Road project, where the plaintiffs argued that the EA failed to provide adequate monitoring and analysis of the population data for Management Indicator Species, sensitive species, and listed species. Superior Wilderness Action Network v. United States Forest Serv., Civ. No. 01–29 (MJD/RLE) 2002 WL 171719 at *6 (D.Minn. Jan. 30, 2002) (unpublished) ("SWAN" decision). This Court rejected that argument, noting that the EA decision was not arbitrary and capricious because, among other things, "[d]ocumentation exists concerning research and surveys, which include forest-wide monitoring reports that discuss habitat and population trends." Id.

The record here contains documentation similar to that in SWAN. The Forest Service, in its 2000 annual Monitoring and Evaluation Report, included a summary table of wildlife population trends that included all of the cited MIS species (spruce grouse and northern leopard frog) and VIS species (boreal owl, porcupine, and black tern) at issue. And the EA analyzes potential impacts to the northern leopard frog, boreal owl, black tern, and porcupine—noting either potential increased habitat or no impact on the habitat of those species. For example, the Forest Plan's guidelines require the spruce grouse to have a minimum of 463 acres of appropriate habitat in the Project Area, where the selected Alternative Four provides over 2,000 acres. The record also indicates that the district biologist used her

expertise and access to extensive population data in analyzing any impacts to, and ensuring viability of, the MIS and VIS species. The above demonstrates that the Forest Service's analysis of the habitat data was sufficient for the purposes of the above-noted regulations and 1986 Forest Plans.

Because the Court concludes that the EA was sufficient without population data, it need not address Defendants' arguments (1) that because Plaintiffs mentioned only the Boreal Owl (a VIS) in its administrative appeal, all claims other than those involving that species should be dismissed under *Public Citizen*, 124 S.Ct. at 2213–14; or (2) that the cited regulation applies only to MIS, not to VIS such as the black tern, boreal owl, and porcupine. *See* 36 C.F.R. § 219.19(6).

### D. FS's and FWS's Alleged Violation of ESA and APA

The Court next examines Plaintiffs' argument that the Forest Service's consultation with the Fish & Wildlife Service with regard to the Canada lynx, a threatened species, was insufficient under the Endangered Species Act and the APA.

#### 1. Controlling Statutes

#### (a) Endangered Species Act

The Secretary of the Interior lists species endangered or threatened with extinction, and those listed species are protected under the conservation and biological opinion provisions of the Endangered Species Act ("ESA"). 16 U.S.C. §§ 1533 & 1536. The Canada lynx is a threatened species in Minnesota. *See* 65 Fed.Reg. 16052 (Mar. 24, 2000). The ESA requires all federal agencies to

> insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any ... threatened species or result in the destruction or adverse

modification of habitat of such species which is determined by the Secretary, ... to be critical ....

16 U.S.C. § 1536(a)(2). In fulfilling these requirements, an agency must use the "best scientific and commercial data available." *Id.*

#### (b) Administrative Procedure Act

The Administrative Procedure Act ("APA") provides for judicial review of an agency action. A reviewing court shall hold unlawful and set aside those agency actions, findings, and conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

#### 2. Forest Service's Lack of Formal Consultation with Fish & Wildlife Service Regarding the Canada Lynx

Plaintiffs argue that the Forest Service violated Section 7 of the ESA by failing to properly consult with the FWS to insure that the Project will not adversely affect the Canada lynx, a listed species under the ESA. *See* 65 Fed.Reg. 16052 (Mar. 24, 2000). Plaintiffs also argue that the FWS has failed to list critical habitat for the lynx, even though such a listing is required concurrently with the listing determination. *See Defenders of Wildlife v. Norton*, 239 F.Supp.2d 9, 17 (D.D.C.2002), *injunction vacated as moot by* 89 Fed.Appx. 273, 2004 WL 438590 (D.C.Cir.2004); *see also* 16 U.S.C. § 1533(b)(6)(5). Finally, Plaintiffs contend that the action was arbitrary and capricious because the administrative record is devoid of specific data on lynx populations within the last 24 years.

■ As a threshold matter, Defendants argue that Plaintiffs lack standing as to the Forest Service's consideration of the Canada lynx because Plaintiffs failed to issue a 60–day notice of intent to sue, as

required by the ESA. 16 U.S.C. § 1540(g)(2)(A)(i). At least one court has held that the failure to comply with the 60–day requirement bars bringing an action under the ESA. *Lone Rock Timber Co. v. United States Dep't of Interior,* 842 F.Supp. 433, 440 (D.Or.1994). But the Court believes that such a notice of intent to sue under the ESA is unnecessary in light of *Bennett v. Spear,* 520 U.S. 154, 175, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), which held that the APA provides judicial review of all "final agency action for which there is no other adequate remedy in a court." *See also Strahan v. Linnon,* 967 F.Supp. 581, 592 n. 12 (D.Mass. 1997) (holding 60–day notice inapplicable and declining to follow *Lone Rock Timber Co.* because the pleadings provided defendants with fair notice of plaintiff's challenge). As such, the Court shall exercise jurisdiction over the both the Forest Service and FWS.

In July 2002, the Forest Service informally consulted with the FWS, as part of the EA process, to evaluate the potential effect that the Project may have on the lynx. The following month, the FWS concurred with the Forest Service's conclusion that the Project alternatives "may affect, but are not likely to adversely affect the lynx." The Forest Service's Biological Evaluation ("BE") concluded that after the Big Grass harvest,

> suitable habitat will remain above minimum levels set by the Lynx Conservation Strategy, prescribed fire will have negligible effects on habitat for the lynx or its prey, and compacted snow as a result of recreation trails and Forest back-country roads and trails is not likely to increase significantly as a result of the select alternative.

■ A BE is arbitrary and capricious if the Forest Service relies on factors that Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

■ Here, the Forest Service's consultation with the FWS regarding the Canada lynx was not to be arbitrary and capricious. The ESA's regulations require formal consultation when a proposed agency action "may affect" a listed species or critical habitat. 50 C.F.R. § 402.14. But formal consultation is not required where the FWS issues a "written concurrence" that the proposed agency action "is not likely to adversely affect any listed species or critical habitat." 50 C.F.R. § 402.14(a) & (b); 16 U.S.C. § 1536.

The record demonstrates that the Forest Service and FWS had previously developed conservation strategies known as Canada Lynx Conservation Assessment and Strategy (the "LCAS") for use with Section 7 consultations. Thus, when the Forest Service develops a proposed action in lynx habitat, such as the Big Grass Project, the Forest Service may refer to the LCAS for "conservation measures that could be taken to remove or minimize the identified risks" to the lynx. Here, the Forest Service and FWS agreed to implement the LCAS measures into the BE, thereby eliminating or minimizing adverse impacts to the Canada lynx.

■ The record also demonstrates that Defendants used the "best available" scientific data in their "Not Likely to Adversely Affect" determination. *See* 16 U.S.C. § 1536(a)(2). Where "the available data do not settle a regulatory issue, the agency must then exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion." *Fisher-*

men's Dock Coop., Inc. v. Brown, 75 F.3d 164, 172 (4th Cir.1996) (citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 52, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). The Eighth Circuit has held that the ESA requires only that agencies "seek out and consider all existing scientific evidence relevant to the decision at hand." Heartwood, Inc. v. United States Forest Serv., 380 F.3d 428, 436 (8th Cir.2004).

Finally, the precedential role of Norton—with regard to listing the Canada lynx—is in question in light of the appellate court's subsequent dismissal of the injunction as moot, under parties' agreement. See Defenders of Wildlife v. Norton, 239 F.Supp.2d 9, 21–22 (D.D.C.2002), injunction vacated as moot by 89 Fed. Appx. 273, 2004 WL 438590 (D.C.Cir.2004) (unpublished). The Norton court held that the FWS was in "patent violation" of the statutory mandate to designate critical habitat for the lynx, and it directed the defendants to undertake rulemaking to designate such critical habitat. Id. at 23–24. On appeal, because all parties agreed that the injunction should be lifted, and in light of the district court's apparent indication that it would do so, the appellate court vacated the injunction. Id. at 89 Fed. Appx. 273, 2004 WL 438590.

Here, the Forest Service has demonstrated that it did properly consider lynx habitat and properly consulted with the FWS. That consultation, coupled with the previously developed lynx conservation strategies and a court's general deference to the expertise of the agencies, demonstrates that Defendants' analysis regarding the Canada lynx was not arbitrary and capricious.

### E. Authorization of the Project During Revisions to 1986 Forest Plan

The 1986 Forest Plan expired in June 2001 and was being revised by the Forest Service during this litigation. Plaintiffs argue that the Forest Service violated NEPA's regulations by authorizing the Project during these pending revisions, thereby limiting the land management options in the future plan revision. 40 C.F.R. § 1506.1(a) (prohibiting authorization of actions that limit choice of reasonable alternatives for another pending agency action).

Plaintiffs contend that the clear-cutting and road building authorized by the Project will continue for six years—nearly half of the new Forest Plan's 10–15 year life—and that the Project is inconsistent with the proposed Forest Plan. While the 1986 Forest Plan lists the Project Area as the timber-intensive "General Management Area," the proposed plan lists the Project Area as the less-harvested classifications "Longer Rotation Management Area" and "Recreation Use in a Scenic Landscape"—the latter of which is the least timber-intensive classification. Plaintiffs contend that the Project's permissive harvesting provisions would frustrate the goals of the proposed plan.

■ The record demonstrates that Plaintiffs did not raise this issue in its administrative appeal. See Pub. Citizen, 124 S.Ct. at 2213–14 (barring claims that were not raised in administrative action). Further, there is support for the proposition that the 1986 Forest Plan remains in effect until the effective date of its revision. E.g., Biodiversity Assocs. v. United States Forest Serv., 226 F.Supp.2d 1270, 1302 (D.Wyo.2002). Finally, the regulation itself recognizes that agency actions may go forward while a plan is being revised. 40 C.F.R. § 1506.1(c) (providing exceptions to prohibition on major federal actions during revision of a plan).

The Court has not found any authority that would expand 40 C.F.R. § 1506.1(a) to require the Forest Service to complete the

revision of its entire Forest Plan before it could undertake action that would potentially limit its alternatives in the future. As such, it is clear that the cited regulations, alone, do not straightjacket the Forest Service from enacting potentially limiting alternatives during the time-intensive process of revising the Forest Plan.

### F. The Forest Service's Alleged Violation of NEPA and APA for Declining to Issue an EIS

Plaintiffs next argue that the Forest Service illegally concluded in its EA that an Environmental Impact Statement ("EIS") was not necessary for the Project. For the foregoing reasons, the Court agrees that the EA has failed to properly analyze the effects of the Project, and that Plaintiff has demonstrated a substantial possibility that the action may have a significant impact on the environment, requiring the preparation of an EIS.

### 1. Standard of Review for Declining to Issue an EIS

The Forest Service prepares a programmatic EIS for each national forest as part of the Forest Plan required by the NFMA. *Sharps v. United States Forest Serv.*, 823 F.Supp. 668, 675 (D.S.D.1993), *aff'd* 28 F.3d 851 (8th Cir.1994); *see* 40 C.F.R. § 1502.9(c)(1). If new and significant site-specific environmental impacts arise that were not evaluated within the programmatic EIS, the Forest Service may be required to issue a supplemental EIS. *Sharps*, 823 F.Supp. at 675; *see* 40 C.F.R. § 1508.9(a). A supplemental EIS is not required for every proposed action but is required for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). For subsequent site-specific projects, an EIS is required only if the project will significantly affect the environment. *Sharps*, 28 F.3d at 852 n. 2; 40 C.F.R. § 1501.4.

To determine whether an EIS is required, an agency shall perform an EA, which is a "concise public document" that serves to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare" an EIS or a Finding of No Significant Impact ("FONSI"). 40 C.F.R. § 1508.9(a)(1). A completed EA leads to one of two findings: that an EIS must be prepared because of potentially significant environmental impacts from the proposed action, or that an EIS is unnecessary because the proposed action "will not have a significant effect on the human environment." 40 C.F.R. §§ 1501.4(c)-(e) & 1508.13.

The decision of whether an EIS is necessary may require the kind of factual determination in which courts typically defer to the administrative agency. *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (requiring "clear error of judgment"). Thus, an EA should be upheld if the Forest Service "took a 'hard look' at the project, identified the relevant areas of environmental concern, and made a convincing statement for its FONSI." *Newton County Wildlife Ass'n v. Rogers*, 141 F.3d 803, 809 (8th Cir.1998) (quotation omitted). But to prove that the Forest Service's decision not to prepare an EIS was contrary to law, a plaintiff needs to show "only that there is a substantial possibility that the action *may* have a significant impact on the environment, not that it clearly will have such an impact." *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 18 (2d Cir.1997) (emphasis added); *see Sierra Club v. United States Forest Serv.*, 843 F.2d 1190, 1193 (9th Cir.1988) (holding the standard is whether "plaintiff has alleged facts which, if true, show that the proposed project *may* significantly degrade some human environmental factor") (emphasis in original) (internal quotations omitted); 40

C.F.R. § 1508.3 ("affecting" means "will *or may* have an effect on") (emphasis added).

■■■■■■■ An EA alone is sufficient for the environmental review required under NEPA "only in those obvious circumstances where no effect on the environment is possible." *Natural Res. Def. Council v. Duvall*, 777 F.Supp. 1533, 1538 (E.D.Cal.1991). For these circumstances to exist, "the conclusion reached must be close to self-evident and would not require an extended document incorporating other studies." *Id.* A court must defer to agency conclusions that are "fully informed and well-considered," but it need not rubber stamp a "clear error of judgment." *Anderson v. Evans*, 371 F.3d 475, 486–87 (9th Cir.2004) (quotations omitted). Accordingly, an EIS is not required "only when the proposed action '*will not* have a significant effect on the human environment.'" *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 13 (2d Cir.1997) (quoting 40 C.F.R. § 1508.13).

## 2. National Environmental Policy Act

The National Environmental Policy Act, or "NEPA," requires an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c). An EIS for such actions is required so that the federal government may be accountable for, and the public may be fully informed about, the effects of those actions. *See* 40 C.F.R. § 1500.1(b). When determining whether the effects of a project are "significant," the Forest Service must consider the context of the project, including the affected region, the affected interests, and the locality. 40 C.F.R. § 1508.27(a). The significance of a project will vary with the setting of the proposed action. *Id.*

An agency must include the following factors, among others, when deciding whether an EIS is necessary:

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

. . . . .

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

. . . . .

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

40 C.F.R. § 1508.27(b).

If a proposed action may affect other agency proposals under consideration, before that agency issues a record of decision, NEPA prohibits taking an action (1) that would "[h]ave an adverse environmental impact"; or (2) that would "[l]imit the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a).

## 3. "Significant Impacts" of the Project

NEPA requires an EIS for all major federal actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c). "Significance" under NEPA is defined in terms of context and intensity. 40 C.F.R. § 1508.27. A project's context is determined in part by "the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a)-(b). When the question of whether an action will result in a significant impact is a

"close call," an EIS should be prepared. *Hoffman,* 132 F.3d at 13 (citing *Foundation for N. Am. Wild Sheep v. United States Dep't of Agric.,* 681 F.2d 1172, 1178 (9th Cir.1982); *Save Our Ten Acres v. Kreger,* 472 F.2d 463, 467 (5th Cir.1973); 40 C.F.R. § 1508.3).

As noted above, the Forest Service acknowledged that the Project's location in a narrow corridor separating two units of the Boundary Waters renders it a "unique area." Plaintiffs contend that even though Defendants acknowledge that the Project will affect the wilderness, they failed to properly analyze those effects. Instead, the Forest Service merely concluded that "none of the proposed harvest units are adjacent to busy entry points or within close proximity to campsites" and that any "effects of the noise of the timber harvest on wilderness users would be minimal and of short duration."

Defendants contend that no statutory standards provide direction as to managing a buffer area (such as the Project area) adjacent to the BWCAW boundary. Before coming to the conclusion that an EIS was not necessary, the Forest Service argues that it took a "hard look" at several factors: (1) the area between the BWCAW and the Project, (2) roads, (3) connectivity between portions of the BWCAW, (4) recreational use of the land, and (5) the boundary line between the Project and the BWCAW.

The management of the Boundary Waters is governed by the Wilderness Act (16 U.S.C. §§ 1131–1136), and the BWCAW Act (Pub.L. No. 95–495). The Wilderness Act prohibits roads, motors, and timber harvesting in wilderness and requires the Forest Service to "be responsible for preserving the wilderness character of the area." 16 U.S.C. § 1133.

### (a) Road Construction

■ Plaintiffs argue that the Forest Service's decision was arbitrary and capricious based on evidence that the FS's lack of analysis regarding how the illegal use of the Project's roads may affect the Boundary Waters. The Forest Service has recognized that motorized vehicles, including ATVs, illegally use newly constructed roadways. The record supports Plaintiffs' argument that the Forest Service has not taken the required "hard look" of specifically analyzing the impact of the "easier access" from road construction adjacent to the Boundary Waters.

Defendants contend that the Forest Service has included analysis of the impact of roads and that it reasonably concluded that an EIS would be unnecessary because all temporary access roads would be decommissioned after harvest; those closed roads would be unlikely to lead to trespasses into the Boundary waters; and the 1986 Forest Plan requires the Forest Service to provide road access for the multiple uses of forest management, fire prevention, recreation, and for access to reach private lands.

However, the Forest Service's EA contains little to no analysis of any illegal use of "closed" roads in the Project. This omission is particularly significant in light of the record's demonstration that there are only three enforcement officers in the entire Superior National Forest, the questionable efficacy of road closures through use of berms and gates, and the Forest Service's concession that such illegal uses have and do occur in the Little East Creek portion of the Forest. As such, the Forest Service has not provided sufficient analysis to support its conclusory statement that "new road building or re-opening closed ones" are "not expected to result in any cumulative adverse effects." The analysis

of this factor favors the necessity of preparing an EIS.

### (b) Recreational Users

■ Plaintiffs next argue that the Forest Service must consider the impact on the past, present, and reasonably foreseeable use of the Project Area by recreational visitors to the Forest. The severity of a project's impact is determined, in part, by whether the action's effects involve unique or unknown risks. 40 C.F.R. § 1508.27(b)(5). The Forest Service stated in its EA that the Project area is "unique" due to its high recreation use and its role as an "important corridor linking the isolated Trout Lake Unit to the rest of the BWCAW."

The Forest Service failed to fully analyze and support its conclusions that any impacts on recreational users would be "short in duration," especially in light of its acknowledgement that the selected Alternative Four "may have slightly greater impact on the recreation resource." Plaintiffs have demonstrated that the record contains ample evidence that the Project area is used heavily year-round by recreational visitors, contains one of the most frequently traveled roads in the Forest (the Echo Trail), and provides visitors to the Forest with a unique wilderness experience.

Defendants further acknowledge that the Project would result in temporary visual, noise, and emissions impacts on hikers, but they argue that the short duration—likely several years—coupled with the small number of hikers in the area, minimize those adverse effects. The EA's analysis in this regard is insufficient to demonstrate that that Forest Service took the requisite "hard look." As such, the record's lack of analysis into the extent of these effects on recreational users further favors preparation of an EIS.

Based on the above analysis of significant impacts that would require an EIS—including impacts from road construction, recreational users, and connectivity between the Boundary Waters areas—the Court concludes that the Forest Service's investigation of the available evidence lacks the "hard look" required for a finding of no significant impact, and the obviation of the need for an EIS.

### 4. "Cumulative Impacts" of the Project

In the alternative to the significant impacts analysis, Plaintiffs next argue that the EA's analysis of the Project's cumulative impacts was insufficient. Plaintiffs argue that the potential for substantial cumulative effects from other timber sales in and around the Project Area requires the preparation of an EIS.

When determining the scope of the required analysis under NEPA, an agency must consider the proposed action and all connected actions, similar actions, and cumulative actions. 40 C.F.R. § 1508.25(a); see *Soc'y Hill Towers Owners' Ass'n v. Rendell,* 210 F.3d 168, 180 (3d Cir.2000) (holding that if cumulative impact of a project and other planned projects is significant, "an applicant can not simply prepare an EA for its project, issue a FONSI, and ignore the overall impact of the project"). The required analysis includes "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions," regardless of what agency or person undertakes such other actions. 40 C.F.R. § 1508.7. These cumulative impacts can result from "individually minor but collectively significant actions taking place over a period of time." *Id.* Accordingly, the administrative record must disclose "a reasonably thorough discussion of the significant aspects of the probable environmental consequences."

*Swanson v. United States Forest Serv.*, 87 F.3d 339, 343–44 (9th Cir.1996) (quotation omitted).

### (a) Analysis of Past and Future Timber Sales

 Plaintiffs argue that the Forest Service's analysis of past and future timber sales was inadequate because it only listed the sales and approximate acreage harvested without analyzing the cumulative impact of those harvests. The Forest Service is required to present a "detailed statement" so that a court may determine whether the agency has made a good-faith effort to consider the values NEPA seeks to protect. *Minn. Pub. Interest Research Group v. Butz*, 541 F.2d 1292, 1299 (8th Cir.1976). General statements that "merely catalog environmental facts" are legally inadequate in light of the relevant standard; rather, "some quantified or detailed information" is required. *Dombeck*, 164 F.3d at 1128; *Neighbors of Cuddy Mountain v. United States Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir.1998) (holding that general, perfunctory statements about "possible" effects and "some risk" do not constitute "hard look," absent justification of why more definitive information could not be provided).

The Forest Service has provided data with regard to about 23 timber sales over the past 30 years, for both public and private land. Defendants contend that the Forest Service's review in the EA was "adequate" with "the best information that we can gather," despite the Forest Service's acknowledgement that it lacks information from agencies and landowners who are not "forthcoming" regarding their plans.

 The Court finds that simply listing past timber sales on public land, without providing a more detailed analysis of the cumulative effects of those sales, does not constitute the "hard look" required under NEPA. *See Dombeck*, 164 F.3d at 1128 (holding that general statements merely cataloging environmental facts are legally inadequate where relevant standard requires quantified or detailed information); *Neighbors of Cuddy Mountain*, 137 F.3d at 1379–80 (holding that very general analysis of timber sales was insufficient to provide "hard look" under NEPA and NFMA). Demonstrating its lack of analysis of cumulative impact, a portion of the EA concedes that "[i]t is unknown what has been harvested on private lands." This lack of detail is insufficient for the purposes of an Environmental Assessment.

### (b) Ongoing Harvesting Activities: Plantation Timber Sale, Holmes–Chipmunk Project, and Private Land

Plaintiffs next argue that the EA failed to analyze the cumulative effects of ongoing harvesting activities, including the Plantation Timber Sale and Holmes–Chipmunk Project, both of which are near the Big Grass Project.

 Defendants assert that because the issue of the cumulative effects of Holmes–Chipmunk was not raised in the administrative proceedings, it is waived and must be dismissed under *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 124 S.Ct. 2204, 2213–14, 159 L.Ed.2d 60 (2004). Whether a particular cause of action requires issue exhaustion is determined, first, by the text of the statute governing that cause of action. *Sims v. Apfel*, 530 U.S. 103, 108, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). Where no such statutory or regulatory requirement exists, a plaintiff's duty to exhaust an issue in the administrative forum before raising that issue in court is next based on the "extent to which the particular administrative proceeding is analogous to normal adversarial

litigation," which requires an issue to be raised in the trial court before being considered at the appellate level. *Vt. Pub. Interest Research Group v. United States Fish & Wildlife Serv.*, 247 F.Supp.2d 495, 515 (D.Vt.2002) (internal quotation omitted).

Neither the text of NEPA nor its implementing regulations specifically require issue exhaustion. *See Vt. Pub. Interest Group*, 247 F.Supp.2d at 516; 40 C.F.R. § 1506.1. Further, the public comment process for an EA is not analogous to an adversarial proceeding that would require issue exhaustion. As such, issue exhaustion regarding the Holmes–Chipmunk project was not necessary.

▇▇▇ The record demonstrates that the Plantation and Holmes–Chipmunk sales, as well as future harvests, were given short shrift by the Forest Service, which stated only that "the known potential harvests on other ownerships would occur on State lands." NEPA requires more than a mere acknowledgement of impacts on adjacent lands; rather, the statute requires an *analysis* of those cumulative impacts. The EA demonstrates this under-supported analysis when the Forest Service stated that it lacked any knowledge as to "what practices are in place in regards [sic] to the biomass [tree] removal on other ownership, or what mitigations are used."

The record further demonstrates that the Forest Service has not made the requisite analysis with regard to cumulative effects of harvests on privately owned land. The EA states that timber harvests have occurred on private land and will likely occur in the future, but it demonstrates its lack of analysis into the extent of the effects of those harvests when it states that "[i]t is unknown what has been harvested on private lands. It is unknown how much planting was done on other ownerships for converting forest types." In light of the fact that approximately 23%

of the Project Area (3,554 acres) is on privately owned land, this lack of analysis with regard to privately owned land is insufficient. *See League of Wilderness Defenders–Blue Mountains Biodiversity Project v. Zielinski*, 187 F.Supp.2d 1263, 1271 (D.Or.2002) (holding failure to consider effects from adjacent private-land harvests sufficient for asserting necessity of EIS).

▇▇▇ The Forest Service's lack of analysis regarding the cumulative impacts of the Project and ongoing harvesting activities demonstrate that an EIS is necessary. Conclusory assurances, without support, do not substitute for the analysis provided by an EIS. *Neighbors of Cuddy Mountain*, 137 F.3d at 1379 (reasoning that if Forest Service does not present quantified or detailed information, courts and public cannot be assured that it provided requisite "hard look"); *see League of Wilderness Defenders–Blue*, 187 F.Supp.2d at 1271 (holding failure to consider forest practices on adjacent private land is a ground for asserting that an EIS is required). As such, the Court concludes that the Forest Service's decision to forego the preparation of an EIS was arbitrary and capricious under both the significant impact and cumulative impact analyses.

**G. Plaintiffs' Motion for Preliminary Injunction**

On June 3, 2004, Plaintiffs filed a Motion for Preliminary Injunction, asking the Court to enjoin the defendants from implementing the timber harvests authorized by the Project. Defendants did not file a response to Plaintiffs' motion, no hearing was scheduled for that motion, and the parties went forward with their respective motions for summary judgment. As detailed above, the Court grants Plaintiffs' motion for summary judgment regarding Count I of the Complaint, concerning the Forest Service's failure to prepare an EIS.

Because the Forest Service's preparation of an EIS will necessarily prevent it from implementing the timber harvests at issue, Plaintiffs' motion for preliminary injunction shall be denied as moot.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that

1. Federal Defendants' Motion to Dismiss and for Summary Judgment [Docket No. 62] is **GRANTED IN PART AND DENIED IN PART**, as follows:

 a. Defendants' motion to dismiss Plaintiff Defenders of Wildlife as a party is **GRANTED**;

 b. Defendants' motion for summary judgment with regard to its alleged violations—regarding MIS, VIS, and project authorization during Forest Plan revisions—is **GRANTED**;

 c. The remainder of Defendants' motion is **DENIED**;

2. Intervenors–Defendants' Motion for Summary Judgment [Docket No. 59] is **GRANTED IN PART AND DENIED IN PART**, as detailed above;

3. Plaintiffs' Motion for Summary Judgment [Docket No. 29] is **GRANTED IN PART AND DENIED IN PART**, as follows:

 a. Plaintiffs' motion for summary judgment regarding Count I of the Complaint, concerning the Forest Service's failure to prepare an EIS, is **GRANTED**;

 b. The remainder of Plaintiffs' motion is **DENIED**.

4. Plaintiffs' Motion for Preliminary Injunction [Docket No. 42] is **DENIED AS MOOT**.